Present:  All the Justices

MARGARET JONES

v. Record No. 010136   OPINION BY JUSTICE LEROY R. HASSELL, SR.
                                            March 1, 2002
FORD MOTOR COMPANY

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
M. Langhorne Keith, Judge

In this appeal of a judgment entered in favor of an automobile manufacturer, the primary issue we consider is whether the manufacturer's purported judicial admission barred the plaintiff from presenting evidence that the manufacturer had notice of an alleged defective condition in an automobile.

I.

The plaintiff, Margaret Jones, filed her motion for judgment against Ford Motor Company (Ford) and Cherner Lincoln Mercury-Annandale, Inc. (Cherner Lincoln Mercury).  She alleged that she and her husband purchased a 1991 Lincoln Town Car, manufactured by Ford, from Cherner Lincoln Mercury's predecessor in interest.

The plaintiff pled that she was injured when a defect in the cruise control system in her Lincoln Town Car made the car accelerate suddenly without warning, causing the car to travel out of control across a street and crash into a concrete stanchion.  The plaintiff alleged, among other things, that Ford negligently designed the car's cruise control system,

negligently failed to warn her that the Lincoln Town Car could accelerate suddenly, and breached certain warranties.

The plaintiff alleged that Cherner Lincoln Mercury breached its warranty of merchantability to her for the following reasons:  the car was defectively designed because of defects in its throttle and cruise control systems, and the car was not adequately and properly tested for the purpose of determining whether a sudden unintended acceleration event was possible.  Ford and Cherner Lincoln Mercury filed separate grounds of defense and denied any liability to the plaintiff.

The litigants filed numerous pretrial motions.  Ford filed a motion in limine to exclude as evidence a study that Ford had commissioned, referred to as the Updegrove Study. Ford also filed motions in limine to exclude evidence of other accidents, incidents, complaints, and lawsuits.  The plaintiff requested that the court permit her to use the depositions of a Virginia State Trooper and three United States Secret Service employees who had experienced unintended sudden acceleration events similar to the incident that she had experienced.  These deponents were operating cars manufactured by Ford when the unintended sudden acceleration events occurred.

On the morning of trial, the plaintiff dismissed her cause of action against Cherner Lincoln Mercury.  The circuit

court permitted Ford to make a purported judicial admission that it had "[n]otice that there were sudden acceleration incidents in cars equipped with stand-alone cruise-control systems." Once Ford made this purported judicial admission, the circuit court ruled that the plaintiff could not use the depositions of the United States Secret Service employees, the State Trooper, or any information contained in the Updegrove Study. At the conclusion of the trial, the jury returned a verdict in favor of Ford. The plaintiff appeals.

                                II.

In 1991, the plaintiff and her husband purchased a 1991 Lincoln Town Car, manufactured by Ford. The car was equipped with a cruise control system. On February 3, 1998, the plaintiff and her husband took the car to a gasoline station near their home in Spotsylvania County. The plaintiff's husband, who drove the car to the gasoline station, got out of the car, pumped gasoline, and went inside the station to pay the attendant.

The plaintiff, who had been seated in the front passenger seat of the Lincoln Town Car, noticed a truck. She "got the impression" that the truck driver wanted to leave the gasoline station parking lot. Her car was "blocking him in," so she decided to move the car in reverse about seven to ten feet and stop so that the truck driver could exit.

The plaintiff moved "over into the front seat, the driver's side." She stated: "And I sat there for a few minutes - seconds, I guess, and made sure that I was square in the seat. . . . So then I took and proceeded to start the car. And I had my foot on the brake and - very lightly. And then I took and started the car. And then I pulled it into reverse. And at that moment that car took off like you wouldn't believe. And it crossed over four lanes of traffic and into the little mini mall where I hit a cement light pole, and that stopped the car." The plaintiff testified that when she shifted the car from park to reverse, she kept her foot on the brake pedal.

The plaintiff remembered "being tossed around in the car," and she had a large "gash" on her head. She stated that "I had broken my hand and . . . my back." As a result of injuries she received in the accident, the plaintiff was "paralyzed from [her] breasts down."

Victor J. DeClercq, who had been employed with Ford for approximately 28 years and served as its corporate representative at trial, qualified as an expert witness. He testified as follows. There are only two ways to control the speed of a car: use of the cruise control system or physical application of the car's accelerator pedal.

4

The 1991 Lincoln Town Car was manufactured with an automatic transmission and was equipped with a cruise control system, also referred to as a "speed control" system. The cruise control system maintains a speed selected by the driver of the car when the system is activated. When the driver of a Lincoln Town Car activates its cruise control system, a canister, referred to as a servo, is either filled with or relieved of vacuum pressure from the engine. The pressure either pulls or releases a cable that controls the car's throttle.

The throttle controls the volume of intake air. The quantity of fuel and air that enters the combustion chamber determines the engine speed and engine power. The throttle either reduces or increases the speed of the engine. The throttle is connected to the accelerator pedal, commonly referred to as the gas pedal, by a throttle cable or linkage. When the driver of a car presses the accelerator pedal, that act causes the linkage to open the throttle, which in turn increases the engine speed.

The electronic cruise control system has several components, including the cruise control "off and on" switch, a "set acceleration" button, a "resume" button, and a "coast" button. Wires extend from the controls on the control panel to the speed amplifier. The speed amplifier is described as

5

the "brains" of the system.  Electronic components in the speed amplifier receive signals or impulses and interpret them.  The speed amplifier emits electronic signals to the servo, which controls the throttle.

DeClercq testified that if the driver of a car applies the brake pedal, the cruise control system will disengage. The brake pedal emits a signal to the amplifier located within the servo, and the amplifier directs the throttle to close, thereby disengaging the cruise control.  The driver of the car only needs to press the brake pedal about one-quarter of an inch to disengage the cruise control.  According to DeClercq, if an accelerator pedal is pressed completely to the floor, the driver of the vehicle would still be able to stop the car by pressing the brake pedal because that act causes the wheels to stop turning.

Samuel K. Sero, who testified on behalf of the plaintiff, qualified as an expert witness on the subject of electrical engineering.  He opined that the plaintiff's 1991 Lincoln Town Car suddenly accelerated without warning because of a defect in its cruise control system.  He testified, just as DeClercq, that there are only two ways to control the speed of a car, the driver's application of the accelerator pedal and use of the cruise control system.  Sero opined that the plaintiff's car suddenly accelerated because an instantaneous negative

6

transient electrical signal was transmitted to the solenoids, which are in the servo. This transient electronic signal directed the cruise control system to open the throttle, causing the engine to accelerate rapidly. Sero stated that a transient signal will cause the cruise control to continue to operate until the servo receives a signal directing the servo to close the throttle, thereby slowing the car.

Sero testified that his review of Ford's documents indicated that Ford was aware of problems caused by negative transient electronic signals. He also testified that Ford did not perform any transient signal testing on the output of its cruise control system.

DeClercq contradicted Sero's testimony about the cause of the plaintiff's accident. DeClercq testified within a reasonable degree of engineering certainty that there was not a transient electronic signal in the cruise control system that caused the plaintiff's accident. He examined and performed tests on the plaintiff's Lincoln Town Car after the accident, and based upon his evaluation, examinations, and inspections, he opined that there were no defects in the electrical or cruise control systems.

DeClercq gave the following testimony without any objection from the plaintiff:

"Q: Do you have an opinion with reasonable engineering certainty as to whether or not this vehicle on the date of the accident could have accelerated in reverse if the plaintiff had applied the brake pedal?

"A: I have an opinion.

"Q: What is that?

"A: It could not have moved."

Lee Carr testified as an expert witness on behalf of Ford. He qualified as an expert witness on the subjects of automotive engineering, vehicle dynamics, and human behavior. He testified, without objection from the plaintiff, that the cause of the accident was "likely the driver, Mrs. Jones; [she] pushed on the throttle and mistakenly thought she was pushing on the brake, but wasn't. I believe the vehicle responded to that by doing what it was told to do, and it backed up, and it backed up at ever-increasing speed until it ran into a pole across the street from the gas station."

Robert Quinn Brackett, Jr., who qualified as an expert witness on the subject of human factors, also testified on behalf of Ford. He was permitted to give an opinion, without any objection from the plaintiff, that the plaintiff made a mistake in that she pressed the accelerator pedal instead of the brake pedal and that this act caused the accident.

The plaintiff sought to admit in evidence the testimony of a Virginia State Trooper and three United States Secret

8

Service employees.  Ronald H. Campbell, a State Trooper who had been trained regarding the operation of vehicles in skidding conditions, hot pursuit driving, and the proper operation of a vehicle, gave the following testimony in his videotaped deposition, which the circuit court refused to permit the plaintiff to present to the jury:

"Q:  Describe for the jury, please, what happened on September 8, 1991.

"A:  Again, as I say, this happened at our residence.  My wife had come back from shopping and buying some groceries.  She had backed the vehicle up in our driveway adjacent to the sidewalk near our rear steps. . . .  The vehicle [a 1991 Grand Marquis, manufactured by Ford] was cut off.  It was a hot day. . . .

"I went in and spoke to her.  The vehicle may have been cut off somewhere like 45 minutes to an hour.  Due to it being hot when I came back out to continue working outside, I decided to move the vehicle from the sun[ny] area that it was in over to some shade trees.  This area, I would estimate probably 80 to 100 feet.  It is just an estimate away.  I got in the vehicle, started it up, put my foot on the brake, put the vehicle – the

9

transmission shifted it from park to drive. I did not have to make any adjustments to the seats or the mirrors because I was going just a short distance.

"I did not put my seat belt on because I was going a short distance and was on private property, but I did close the door. I released the pressure that I had with my right foot [-] that is what we are trained to use our right foot for accelerating [and] braking. That is the foot that I always use to brake and accelerate with. I released the pressure from the brake pedal, and the vehicle began to move forward on its own. It idled normally. There [were] no signs of any racing or any malfunction of the engine. It went approximately 20 or 22 feet. This is a slight grade down that I would be doing not a significant grade.

"Then suddenly without warning the vehicle accelerated and it accelerated abruptly. The engine was racing. I -

"Q: Where was your foot all of this time?

"A: My foot was hovering at first between the brake and the accelerator because I had released the pressure from the brake. The vehicle began to move. At that point, I saw that I was coming up on the

10

trees, and I was planning to park near the shade. I begin to cut the vehicle. The trees would have been straight ahead of me. At the angle I was going I cut the vehicle sharply to the left, and I quickly did a series of things. I looked down, I assumed that maybe my wife had put something on the seat or something had rolled out and was hitting the accelerator or blocking the brake. I started trying to hit the brakes again. There was no effect, just like I didn't have the brake on. I looked down to see what the problem was. There was nothing against the accelerator. There was nothing blocking the brake pedal.

"At this point I could see, you know, where my foot was. It was on the brake. I continued to cut the vehicle to the left sharply. The wheels are rotating and sliding. I refer to it as going into a jarring or rotating around. At this point I see that I have a open gate that leads to our pasture. And my thinking was if I can steer away from this trouble, which is what we are trained to do, get this vehicle through that gate into the open pasture, I would have time to stop the vehicle safely. But due to having to cut the vehicle

sharply there was a guide wire to my right.  I tried to avoid that.  It was a telephone pole to my left, a utility pole.  I would say the vehicle continued to rotate around, and I went through between the guide wire and the utility pole in a broadside position with my front end had turned around –

. . . .

"Q:  What were you observing and thinking all of this time?

"A:  At first I didn't know what to think.  I could not understand what was causing this vehicle to accelerate.  And as I steered the vehicle, it went into this slide, and I saw that the vehicle was going completely out of control.  The front bumper guard just did touch the utility pole and the vehicle continues right around and the front end swaps from a north direction to a south direction. And I am looking at the propane tank in our backyard.  At that point I thought I literally was going to die right there if I don't get this vehicle stopped.  And at that point that is when I took and jammed the gear selector from drive into park.

"Q:  What happened?  Did you hear any noises?

"A:  Yes, sir, I did.

"Q:  Describe for the [c]ourt and jury what you heard and what happened to you?

"A:  It is difficult to describe the noise that it made, but it made kind of like a clicking, ratchety sound as it went up into park.  When it did that, it was such force from the vehicle coming around that the vehicle just literally just sit there just like that and hopped up and down. Prior to me doing this, the force of the vehicle turning around I had just started to slide from under the steering wheel across the seat, but had held onto the steering wheel because I did not have a seat belt on, and it was difficult to stay behind the steering wheel.  After I had put the vehicle into park and it sit there and stopped going up and down, I just sit there.  I was emotionally frightened.  I was weak, you know, literally made me sick at the stomach.

"Q:  What was the engine doing all of this time?

"A:  The engine was revving wide open just racing."

According to Campbell's deposition testimony, he later met with representatives of Ford, including Hanes Barger, an

13

engineer.  Barger inspected the car, and he interrogated Campbell in detail about the sudden acceleration event. Barger was unable to find any defects in the car that could have caused the sudden acceleration.  Campbell also met with a technical service engineer employed by Ford, Ron Bissi.  Bissi informed Campbell that he must have had his foot on the accelerator pedal and not the brake when Campbell's incident occurred.  Campbell replied:

> "And my response to them always and I am absolutely sure of this that I did at no time put my foot on the accelerator, that I had my foot on the brake unless I was pumping the brakes or unless I had released it to try to steer.  And I visually looked down and saw where my foot was located. After the vehicle stopped and the engine continued to rev, both of my feet were in the floorboard of that vehicle touching nothing, but the floorboard."

Campbell's 1991 Grand Marquis accelerated unexpectedly a second time when his wife was driving the car in reverse.

John W. Baker, an employee with the United States Secret Service, Department of Treasury, testified in a deposition in a case styled Vickey Selman v. Ford Motor Co., filed in the United States District Court for the Eastern District of Arkansas, Civil No. PB-C-94-474.  He stated in the deposition

14

that, after he started the engine of a 1991 Lincoln Town Car manufactured by Ford, he shifted the car from "transmission position to drive." His foot was still on the brake pedal. The engine was "idling." Then, the engine began to race, and the wheels began to spin. The car moved forward at a high speed. Baker had to "stand on the brake" in order to stop the car.

Robert A. Diehl, another employee with the United States Secret Service, also gave a deposition in the Selman proceeding. He is an automobile mechanic assigned to the Protective Vehicle Branch of the United States Secret Service. Diehl testified that the acceleration mechanisms in the Lincoln Town Car, Ford Crown Victoria, and Mercury Grand Marquis, automobiles manufactured by Ford, are the same. He stated that the cruise control systems in these vehicles are the same.

He testified as follows:

> "I got in the [Ford] vehicle, started it up, put my foot on the brake. I know I put my foot on the brake because that's just a creature habit of mine, you know, being a mechanic and being around these things, put it into drive, and now I can't tell you 100 percent for sure if that vehicle took off when I removed my foot from the brake when I put my foot on the accelerator, or if it did it while my foot was on the brake, but I know when I put that vehicle into drive is when I had the unintentional acceleration, and the vehicle laid probably ten, 15 feet of rubber in the building. That was smooth concrete floor.

"And the way I was able to get that vehicle to stop, I was able to react quickly to it knowing so much about the vehicles was just by simply turning off the ignition switch. I didn't even bother trying to put both feet on the brakes or anything like that because you just know being in my business that if you kill the electrical source, the car is going to stop."

Theodore M. Steiner, a special agent with the United States Secret Service, also testified in a deposition in the Selman case. He described the following sudden acceleration event involving a Ford Crown Victoria automobile:

"I can remember going out to the parking lot at the Naval Observatory, which is basically the home of the [V]ice [P]resident. We have our command center across the street there, and there was a vehicle out there, the Crown Victoria, and I remember it was running. Someone asked me to move the vehicle because it was blocking another car. So since it was blocking and had to be moved, I remember getting in it and putting it in reverse and all of a sudden it took off. Sudden acceleration, unexplained. I didn't know what was going on. I hit the brake immediately, and at that time the brake didn't seem to stop the vehicle. It still, the tires were squealing, and right behind me was a rail, and the car backed up into it putting itself up on top.
"At that point, I was able to shut the engine off and stop the acceleration, but the braking didn't stop the incident from occurring. It just took off so I knew there was something wrong with the car itself because it was moving so quickly."

Steiner also testified that once he shifted the car from park to reverse, he applied light pressure to the accelerator pedal. "That's when the engine began to race, and even with my foot on the brake, it was even racing at that point to the point where I heard the tires squealing. . . . [A]t the point

16

where the car was in acceleration, I applied tremendous amount of pressure to the brake because I was trying to stop the vehicle, and it wasn't working because the car was still moving in reverse."

Ford compiled information about customer complaints of unintended acceleration incidents in various cars manufactured by Ford. The complaints were compiled in a series of documents described as the Updegrove Study. The study, which includes about 2,900 external complaints of sudden acceleration incidents in cars and trucks manufactured by Ford, was supervised by Allen Updegrove, a Ford employee. This study included a categorization of the unintended acceleration events. Some events were classified as caused by operator error, other events were caused by mechanical malfunction, and a majority of the events were unexplained and classified as "no cause identified."

III.

A.

The plaintiff asserted in pretrial motions that she was entitled to enter into evidence the depositions of Ronald H. Campbell and the three Secret Service employees. She also contended that she was entitled to present as evidence the findings contained in the Updegrove Study.

17

During a pretrial hearing, the following colloquy occurred among the court and counsel for the plaintiff and Ford:

"THE COURT:  Before we get started, let me ask a question.  It seems to me some of these motions can be resolved if the Ford Motor Company is prepared, as they keep saying in their pleadings, to make a judicial admission that the Ford Motor Company had notice that the[re] were sudden acceleration incidents in cars equipped with stand-alone cruise-control systems prior to this incident.

"[FORD'S COUNSEL]:  Your Honor, I don't think there is any dispute that Ford would agree to a judicial admission that there were allegations along those lines prior to this incident.

"THE COURT:  Well, not the allegations; but you had notice of such incidents.

"[FORD'S COUNSEL]:  With these allegations, notice of incidents of these allegations, yes, Your Honor.

"THE COURT:  Notice that there were sudden acceleration incidents in cars equipped with stand-alone cruise-control systems?

"[FORD'S COUNSEL]:  That's correct.

"THE COURT:  And Ford makes a judicial admission to that fact?

"[FORD'S COUNSEL]:  Yes, Your Honor.

"THE COURT:  It seems to me that that takes care of the deposition testimony, the Updegrove Study motions.  I guess it takes care of those two, doesn't it?

"[FORD'S COUNSEL]:  Your Honor, I think it in addition would resolve the motion to exclude evidence of similar incidents.

18

"THE COURT:  Correct.

"[PLAINTIFF'S COUNSEL]:  I don't think it would,  Your Honor, if I could be heard on that.

"THE COURT:  Why not?

"[PLAINTIFF'S COUNSEL]:  Ford has denied that these incidents have occurred to people.  And [Ford has] also said in [a] supplemental answer to Interrogatory No. 21 that Ford states a sudden unintended acceleration of a stationary vehicle cannot be induced or precipitated by a malfunction in a cruise-control system –

"THE COURT:  That has nothing to do with their notice.  You have to show as part of the product liability case that they had notice that there were such incidents.  Whether they agree to the causation of such incidents is another issue.

"[PLAINTIFF'S COUNSEL]:  Right.  But that's why we should be allowed to put on witnesses who also experienced this, because they're saying to the jury that this never happened.

"THE COURT:  The cases are quite clear that you can't put on such evidence to prove your case that it happened in this case.  All you can [do is] put it on . . . for notice. . . ."

Consistent with its pretrial ruling, the circuit court

instructed the jury as follows:

"You are instructed the defendant has admitted that prior to the production of the 1991 Lincoln Town Car and prior to this accident it had received notice of other claims of sudden unintended acceleration events from other operators of other stationary vehicles produced by Ford.
"To the extent that any of plaintiff's claims against the defendant require proof of notice of other claims, this fact is admitted by the defendant and requires no further proof by the plaintiff."

B.

19

The plaintiff argues that the circuit court erred in prohibiting her from using the depositions and the Updegrove Study to show that Ford had notice of a defective condition in its electronic cruise control system. Continuing, the plaintiff contends that Ford's purported judicial admission is illusory because the plaintiff sought to prove that Ford had notice of a defect in its electronic cruise control that causes sudden acceleration, and not merely that Ford had notice of sudden acceleration of its automobiles. Additionally, the plaintiff claims that she was entitled to use the depositions and the Updegrove Study to rebut Ford's evidence that a sudden acceleration in a stationary vehicle cannot occur.

Responding, Ford contends that once it made a judicial admission that it had notice of unintended incidents of acceleration in its vehicles, the plaintiff was prohibited from presenting any testimony on this issue. Ford also argues that evidence of incidents or accidents unrelated to plaintiff's accident is admissible only to show notice and may not be used to corroborate a plaintiff's claims that a product is defective.

As we have already observed, the plaintiff alleged that Ford breached its duty to warn her that the 1991 Lincoln Town Car could suddenly accelerate without warning. We stated in

20

Featherall v. Firestone, 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979), that a plaintiff who seeks to establish that a manufacturer breached its duty to warn must prove that the manufacturer

> "(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> "(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> "(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

(Quoting Restatement (Second) of Torts § 388 (1965)); accord Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 134-35, 413 S.E.2d 630, 634 (1992). In this case, the plaintiff was required to present evidence that Ford knew or had reason to know that its 1991 Lincoln Town Car was or was likely to be dangerous for the use for which it was supplied.

We have also stated the following principles which are pertinent here:

> "The essence of a judicial admission is its conclusiveness. To constitute a judicial admission, the admission must conclusively establish a fact in issue. The admission may not be thereafter qualified, explained, or rebutted by other evidence. Consequently, once a fact has been established by a judicial admission, evidence tending to prove the fact admitted becomes irrelevant."

General Motors Corp. v. Lupica, 237 Va. 516, 520, 379 S.E.2d 311, 314 (1989).

21

Applying these principles, we hold that Ford's purported judicial admission was incomplete and inconclusive. Ford's purported judicial admission did not establish a fact in issue. At best, Ford admitted that prior to its manufacture of the 1991 Lincoln Town Car and prior to plaintiff's accident, Ford had notice of other claims of sudden unintended acceleration events from other drivers of vehicles manufactured by Ford. In its purported judicial admission, Ford did not admit that it had notice that these unintended acceleration events were caused by a defect in its cruise control system. Ford's purported judicial admission of notice of unintended accelerations is not equivalent to an admission that Ford had notice of a defect in the cruise control system in its automobiles. For example, Ford argued in this case that an act of unintended sudden vehicular acceleration can occur if the driver of the automobile mistakenly presses the accelerator pedal instead of the brake pedal. And, the plaintiff does not dispute that a car can accelerate unintentionally if the driver mistakenly applies the accelerator pedal.

Ford specifically disavowed that its manufactured vehicles could accelerate without operator error. And, Ford's expert witness testified that Ford's vehicles could not accelerate in the manner described by the plaintiff and, even

22

if such acceleration occurred, the car's engine would disengage if the driver of the car "taps" the brake pedal. Yet, armed with its illusory judicial admission, Ford was able to bar the plaintiff from presenting evidence to establish that Ford had notice that its vehicles would accelerate suddenly without operator error and that these vehicles would not stop when the drivers applied the brake pedals.

We hold that the circuit court erred in accepting Ford's purported judicial admission. Therefore, the plaintiff should have been allowed to present the deposition testimony of Ronald Campbell and the United States Secret Service employees to show that Ford knew or had reason to know that a defect existed in its vehicles which caused the vehicles to suddenly accelerate and that such acceleration could not be controlled even when the driver of the vehicle applied the brake pedal.

We have stated that

"evidence of similar accidents, when relevant, will be received to establish that defendant had notice and actual knowledge of a defective condition, provided the prior incident occurred under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue. General Motors Corp. v. Lupica, 237 Va. 516, 521, 379 S.E.2d 311, 314 (1989). This rule, however, is limited to proof of notice and actual knowledge and does not authorize admission of the evidence substantively as 'corroboration.' "

Ford Motor Co. v. Phelps, 239 Va. 272, 276-77, 389 S.E.2d 454, 457 (1990). We observe that the record before us contains

23

evidence that the sudden acceleration events that Campbell and the United States Secret Service employees experienced occurred under substantially the same circumstances and had been caused by the same or similar defects and dangers as those in the plaintiff's case.  Even though all the witnesses did not experience sudden acceleration events while operating their cars in reverse gear, this distinction is not material. All the witnesses experienced unintended sudden acceleration and none was able to stop his car with the normal application of the brake pedal.  And, we note that Ford does not argue in its brief that the plaintiff failed to demonstrate that the events of sudden acceleration described by these witnesses fail the test of substantial similarity that we discussed in Phelps.  Indeed, Ford does not make any contentions in its brief regarding the deposition testimony that the plaintiff sought to introduce to establish that Ford had notice of the purportedly defective condition in its cruise control system.

We note that our holding today is consistent with our decision in General Motors Corp. v. Lupica, supra.  In Lupica, two plaintiffs filed separate actions against General Motors Corporation to recover compensatory and punitive damages for injuries they incurred when a car manufactured by General Motors collided with a tree.  The plaintiffs alleged that the car's steering system did not contain a filter or screen to

prevent particles from entering the hydraulic fluid. Consequently, particles in the fluid became wedged between the cylinders within the power steering system and caused it to malfunction. This malfunction caused the automobile to "self-steer" and "go out of control." 237 Va. at 518-19, 379 S.E.2d at 312-13.

General Motors contended that the circuit court erred by admitting certain documents in evidence. We held that evidence of other similar accidents or occurrences, when relevant, is admissible to show that a defendant had notice and actual knowledge of a defective condition, provided that the prior accidents or occurrences happened under substantially the same circumstances and had been caused by the same or substantially similar defects and dangers as those in issue. We stated that such

> "evidence is admissible in a products liability case
> to establish foreseeability and a defendant's duty
> to a plaintiff. When a defendant has notice and
> actual knowledge of a defect, it owes a duty to a
> plaintiff 'to take the steps reasonably necessary to
> remedy the defect.' "

Id. at 521, 379 S.E.2d at 314 (quoting Roll 'R' Way Rinks v. Smith, 218 Va. 321, 329, 237 S.E.2d 157, 162 (1977)). We applied this test in Lupica, and we held that certain exhibits that the circuit court admitted to show notice met the substantial similarity test. However, we also held that other

25

admitted exhibits failed the substantial similarity test because they did not identify specific occurrences. For example, one publication that the circuit court improperly admitted in evidence was a newspaper columnist's exposé about defects in power steering systems manufactured by General Motors and their potential danger to the general public. Another exhibit was improperly admitted because it failed the test of substantial similarity. Id. at 521-22, 379 S.E.2d at 314-15.

Unlike the exhibits that were improperly admitted in Lupica, the deposition testimony before this Court satisfies the test of substantial similarity. Ford concedes that the speed of a car can only be controlled by one of two factors, an act by the driver or the cruise control system. Three of the deponents testified that they did not apply the accelerator pedals, but nonetheless, their cars accelerated and all the deponents testified that the cars would not stop with normal application of the brake pedals. Thus, unlike Lupica, in this case, all the depositions contain evidence of a defect in the manufactured automobile.

C.

The circuit court did not err, however, in its ruling that prohibited the admission in evidence of the Updegrove Study. The Updegrove Study contains unsworn claims of

26

complaints of vehicle malfunction.  There is simply no evidence that the 2,900 claims mentioned in the Updegrove Study occurred under substantially the same circumstances as the plaintiff's incident and had been caused by the same or similar defects and dangers as those in the plaintiff's case. Thus, under our holding in Phelps, this study is inadmissible. And, we observe that we specifically held in Phelps that we will not permit the admission in evidence of complaints of similar accidents to corroborate a plaintiff's version of how an accident occurred.  Phelps, 239 Va. at 276-77, 389 S.E.2d at 457.

For these same reasons, we also hold that the circuit court did not err in refusing to permit the plaintiff's expert witness, William D. Berg, to testify about the Updegrove Study or use it as a predicate for his opinions.

D.

The plaintiff asserts that the circuit court erred in refusing to permit her to present evidence that the opinions offered by Ford's expert witnesses were contradicted and disproven by Ford's study regarding the causes of defects in the cruise control system.  The plaintiff also contends that she was entitled to present other evidence to contradict Ford's expert witnesses.  The plaintiff focuses upon the following testimony that Ford elicited from DeClercq:

27

"Q:   Can the 1991 Lincoln Town Car rapidly accelerate from zero to 20 miles an hour in any way other than by the application of the accelerator?

"A:   No.

.    .    .    .

"Q:   So if that can't happen, is there any reason why you would warn about it or write about it in the owner['s] manual?

"A:   Probably not."

Additionally, DeClercq opined that the Lincoln Town Car could not have accelerated in reverse had the plaintiff applied the brake pedal.

We disagree with the plaintiff's contention that she was entitled to use the Updegrove Study to contradict Ford's expert witnesses.  Based upon the record before this Court, we conclude that the Updegrove Study is not reliable and, therefore, it cannot be used as a basis to impeach Ford's expert witnesses.

We do hold, however, that the circuit court should have permitted the plaintiff to use the deposition testimony of Campbell and the United States Secret Service employees to impeach DeClercq's testimony.  Contradiction can be a form of impeachment and a witness may be impeached with contradictory testimony of others.  The deposition testimony of Campbell and the United States Secret Service employees squarely contradicts DeClercq's testimony that a Lincoln Town Car could

not accelerate if a driver applies the brake pedal.  We do observe, however, that upon retrial, if DeClercq renders the same opinion that he rendered in this case and the plaintiff elects to impeach him with this deposition testimony, Ford is entitled to a jury instruction that this testimony should be considered for impeachment purposes only and not as substantive evidence of the existence of a defect in Ford's cruise control system.  See, e.g., Pugh v. Commonwealth, 233 Va. 369, 374, 355 S.E.2d 591, 594-95 (1987); Stoots v. Commonwealth, 192 Va. 857, 866, 66 S.E.2d 866, 871 (1951).

We disagree with the plaintiff's contention that the circuit court erred when it refused to permit her to elicit questions about DeClercq's conversation with a Ford attorney regarding that attorney's impressions on the appropriate use of resources in defending Ford products and litigation.  The plaintiff sought to elicit information about conversations that DeClercq had with an attorney in Ford's office of the general counsel relating to a case in Wyoming.  The conversation concerned the Updegrove Study and trial strategy in that case.  We hold that the circuit court properly excluded this testimony because it concerned matters protected by the work product doctrine and the attorney-client privilege.

E.

29

Brackett, who testified on behalf of Ford, qualified as an expert witness on the subjects of human factors and behavior science. As he was beginning to testify, the following colloquy occurred:

> "[FORD'S COUNSEL]: And, Dr. Brackett, is it a fair statement that you were asked in this case to determine whether it's a possibility that Mrs. Jones, unfortunately, made a mistake and made a pedal error in this case?
>
> "[PLAINTIFF'S COUNSEL]: Objection; foundation.
>
> "THE COURT: Overruled.
>
> "A: Yes. In fact, that was really my intention or assumption, I was to look at the behavior of the driver involved in the incident to see if there was a possibility of a pedal misapplication or pedal error."

Brackett continued to testify, without any further objection, about experiments he had conducted to test driver reaction time. He stated that he conducted an experiment involving 100 students. Each student was placed in a "buck apparatus" similar to the driver seat area of a car. The participants assumed the driver's position and were confronted with the sudden appearance of obstacles. The students were instructed to apply either the accelerator pedal or brake pedal as quickly as possible when the obstacles appeared. According to Brackett, three of the students incorrectly stepped on the accelerator pedal rather than the brake pedal during this simulated driving test. Based in part upon this

experiment and the opinions of others, Brackett opined that the plaintiff placed her foot on the accelerator pedal when she thought she was applying the brake pedal.

On appeal, the plaintiff argues that the circuit court erred by admitting Brackett's testimony in evidence because the conditions existing at the time of his experiments were not similar to the conditions that existed when the plaintiff was injured. Additionally, the plaintiff argues that Brackett's expert opinions were not admissible because they were based on the opinions of others. We will not consider the plaintiff's contentions because she failed to make a proper objection at trial. We have reviewed the record, and the sole objection that the plaintiff made to Brackett's testimony was the above-referenced statement, "[o]bjection; foundation." This objection is not sufficient to encompass the contentions that the plaintiff raises on appeal. Rule 5:25; see, e.g., Molchon v. Tyler, 262 Va. 175, 183 n.2, 546 S.E.2d 691, 696 n.2 (2001); Hamilton Development Co. v. Broad Rock Club, 248 Va. 40, 44, 445 S.E.2d 140, 143 (1994).

F.

During the discussion among the court and counsel regarding the jury instructions, the plaintiff submitted a jury instruction on the defendant's duty to test and inspect

31

the cruise control system in its automobile.  During that

discussion, the following colloquy ensued:

>"[FORD'S COUNSEL]:  . . . Ford objects to [this instruction] on the grounds that I think that this is not something that is independent from the negligent design claim and that there ought not to be a specific instruction and undue emphasis on the aspect of inspections or testing.
>
>"I think that this is subsumed within the question of whether Ford exercised reasonable care in the design of its product which is covered by all the instructions.
>
>[PLAINTIFF'S COUNSEL]:  We allege failure to test and inspect.  We proved failure to test and inspect.  We're entitled to an instruction on test and inspect.
>
>"THE COURT:  What was the proof of the failure to test and inspect?
>
>[PLAINTIFF'S COUNSEL]:  Mr. DeClercq's own testimony and Mr. Sero's testimony that they never tested on the output side of – with injected signals, negative transients on the output side of the servo.
>
>[FORD'S COUNSEL]:  I know there's a model [jury instruction] on this, Your Honor.  I just don't think it's an independent tort.
>
>THE COURT:  I don't think [the proposed instruction] fits the facts in this case.  Either [Ford] designed it improperly or [Ford] didn't.  And I'm going to refuse [the proposed instruction].
>
>[PLAINTIFF'S COUNSEL]:  Please note my objection."

The plaintiff argues that she presented sufficient

evidence to support her claim that Ford breached its duty to

inspect and test the cruise control system for negative

32

transient signals and that the circuit court erred in failing to grant her requested jury instruction.  Responding, Ford states:  "Plaintiff claims that the trial court erred by failing to give a 'duty to test' instruction.  On this issue, the trial court properly found that such an instruction was unnecessary because the duty to test is subsumed within the general duty of the manufacturer to avoid acting in a negligent manner, and was thus covered by the general negligence instructions given in the case. . . .  There was no error in refusing this instruction."

We observe that upon our review of the plaintiff's motion for judgment, the plaintiff did not plead that Ford breached a duty owed to her because of its failure to test and inspect the cruise control system.  It is true that the plaintiff alleged in her motion for judgment against defendant Cherner Lincoln Mercury only that the cruise control system "was not adequately and properly tested for the purpose of determining whether a sudden, unintended acceleration event was possible." However, the plaintiff dismissed Cherner Lincoln Mercury from this lawsuit, and she did not amend her pleadings, nor did she request to amend her pleadings, to allege a failure to inspect and test claim against Ford.  A plaintiff may not recover upon a cause of action she failed to plead.  See Ted Lansing Supply v. Royal Aluminum, 221 Va. 1139, 1141, 277 S.E.2d 228, 229-30

(1981).  Therefore, the circuit court did not err in refusing the instruction.

G.

The plaintiff contends that the circuit court erred in instructing the jury on the defense of contributory negligence.  The plaintiff argues that the evidence does not support this instruction.  Responding, Ford argues that contributory negligence is a defense to a negligence claim in a product liability action and that it presented evidence to support the instruction.  We agree with Ford.

Ford presented evidence that if a sudden acceleration event occurred because of a defect in the cruise control system, the plaintiff could have stopped the car by applying the brake pedal.  Therefore, the record contains more than a scintilla of evidence to support the granting of a contributory negligence instruction as a defense to the plaintiff's claims of negligence.  See Ford Motor Co. v. Bartholomew, 224 Va. 421, 432-33, 297 S.E.2d 675, 680-81 (1982).  Of course, the contributory negligence defense is not a bar to the plaintiff's breach of warranty claims.  See Wood v. Bass Pro Shops, 250 Va. 297, 300-01, 462 S.E.2d 101, 103 (1995).  If the evidence of contributory negligence remains the same during a new trial, Ford will be entitled to a contributory negligence instruction.

34

The plaintiff argues that if Ford is entitled to a contributory negligence instruction, then she is entitled to a sudden emergency instruction. She asserts that she was confronted with a sudden emergency, and she had no time for the deliberate exercise of judgment. Ford responds that since the jury found that it "was not at fault in this accident, contributory negligence simply was not an issue in the jury's determination of liability in this matter." Ford also argues that "[p]laintiff's present claim that the 'sudden emergency' instruction should have been granted thus represents harmless error at best." Finally Ford asserts that "the refusal to give the charge was sound on the facts of this case, [and] it is in any event moot given the jury's defense verdict." We disagree with Ford's arguments.

We have stated the following principles regarding the sudden emergency doctrine:

> "Under the sudden emergency doctrine, the driver of an automobile is excused from liability if, without prior negligence on his part, he is confronted with a sudden emergency and acts as an ordinarily prudent person would have acted under the same or similar circumstances. Pickett v. Cooper, 202 Va. 60, 63, 116 S.E.2d 48, 51 [(1960)]; Southern Passenger Motor Lines v. Burks, 187 Va. 53, 60, 46 S.E.2d 26, 30 [(1948)].
> "Ordinarily the question of application of the sudden emergency doctrine is for the triers of fact. When evidence is conflicting or different inferences may be drawn from the evidence, it is for the jury

> to say (1) whether [the operator of the automobile] was confronted with an emergency; (2) whether the emergency, if one existed, was created by [the operator's] own negligence; and (3) whether [the operator of the vehicle] conducted himself as an ordinarily prudent person might have done under the same or similar circumstances."

Cowles v. Zahn, 206 Va. 743, 746-47, 146 S.E.2d 200, 203 (1966); accord Carolina Coach Co. v. Starchia, 219 Va. 135, 141, 244 S.E.2d 788, 792 (1978). And, we have stated that if the sudden emergency doctrine is to apply, the conditions confronting the operator must be an unexpected happening, an unforeseen occurrence or condition. Gardner v. Phipps, 250 Va. 256, 260, 462 S.E.2d 91, 94 (1995).

We hold that the circuit court erred by refusing to grant the plaintiff's jury instruction on the sudden emergency doctrine. Even though the grant of a sudden emergency instruction is rarely appropriate, such instruction should have been given in this case. There is more than a scintilla of evidence that would have permitted a jury to find that the plaintiff was confronted with an emergency created by the defendant's negligence and that the plaintiff acted as an ordinarily prudent person would have acted under the same or similar circumstances. Therefore, if the evidence is substantially the same during a new trial and if Ford receives an instruction on contributory negligence, the plaintiff will

be entitled to an instruction on the sudden emergency doctrine.

IV.

A.

In summation, we hold the following. Ford's assertion that it had notice of unintended acceleration events did not constitute a judicial admission. Therefore, the circuit court erred in refusing the plaintiff's motion to permit her to introduce in evidence the depositions of Ronald Campbell and the United States Secret Service employees to show that Ford had notice of defects in its vehicles, that the defects could cause its vehicles to accelerate unexpectedly, and that Ford knew or should have known that its vehicles could accelerate unexpectedly even when the drivers of the vehicles applied the brake pedals; the circuit court properly refused to admit the Updegrove Study in evidence; the circuit court did not err in refusing to permit the plaintiff to use the Updegrove Study to cross-examine Ford's expert witness; the circuit court erred in denying the plaintiff's request to use the deposition testimony of Campbell and the Secret Service employees to impeach Ford's expert witnesses; the plaintiff failed to make a proper objection to the testimony of Brackett and, therefore, we do not consider that issue on appeal; the circuit court did not err by instructing the jury on the

37

defense of contributory negligence; the circuit court erred by failing to grant the plaintiff's sudden emergency instruction; and the circuit court did not err in refusing to grant the plaintiff's request for a jury instruction on Ford's duty to test and inspect because she failed to plead that Ford breached such duty.

B.

Accordingly, the judgment of the circuit court is affirmed in part, reversed in part, and this case is remanded for a new trial consistent with the views expressed herein.

Affirmed in part,<br>reversed in part,<br>and remanded.

JUSTICE KINSER, with whom JUSTICE LACY and JUSTICE KOONTZ join, concurring in part and dissenting in part.

Because I conclude that the circuit court did not abuse its discretion in excluding evidence of other alleged similar incidents of sudden acceleration, I would affirm the circuit court's judgment in favor of Ford Motor Company (Ford). I also believe that the court did not abuse its discretion by admitting the testimony of Robert Quinn Brackett, Jr., and that any error in granting the jury instruction on contributory negligence and refusing to instruct the jury on the issue of sudden emergency was harmless. Thus, I respectfully dissent in part and concur in part with the

38

majority decision.  I will address these specific issues and
discuss additional facts where necessary.

### I. JUDICIAL ADMISSION, THE UPDEGROVE REPORT, AND EVIDENCE OF OTHER SIMILAR INCIDENTS

The term "judicial admission" is defined as "[a] formal
waiver of proof that relieves an opposing party from having to
prove the admitted fact and bars the party who made the
admission from disputing it."  Black's Law Dictionary 49 (7th
ed. 1999); see also Charles E. Friend, The Law of Evidence in
Virginia § 18-37 (5th ed. 1999) (" 'Judicial admissions' are
concessions made by a party during the course of litigation
which bind the party and prevent contrary evidence from being
introduced.").  Thus, a party may admit certain facts at
issue, thereby dispensing with the need for proof of the facts
admitted and relieving the other party of proving those facts.
See Eubank v. Spencer, 203 Va. 923, 925, 128 S.E.2d 299, 301
(1962).  See also Pedersen v. Vahidy, 552 A.2d 419, 424 (Conn.
1989); Goldsmith v. Allied Bldg. Components, 833 S.W.2d 378,
380 (Ky. 1992); Clapp v. Clapp, 85 S.E.2d 153, 155 (N.C.
1954); State v. McWilliams, 352 S.E.2d 120, 127 (W. Va. 1986).

We have held that "[t]he essence of a judicial admission
is its conclusiveness."  General Motors Corp. v. Lupica, 237
Va. 516, 520, 379 S.E.2d 311, 314 (1989).  This is so because
such admissions are "made for the purpose of dispensing with

39

the formal proof of some fact at the trial." Virginia-Carolina Chem. Co. v. Knight, 106 Va. 674, 678, 56 S.E. 725, 727 (1907). Thus, "[t]o constitute a judicial admission, the admission must conclusively establish a fact in issue." Lupica, 237 Va. at 520, 379 S.E.2d at 314. The admission may not then be controverted, "qualified, explained, or rebutted" by any other evidence. Id.

Unlike the majority, I believe that Ford's admission conclusively established a fact in issue. Ford admitted that it had notice of other claims of sudden, unintended acceleration from operators of Ford vehicles. The admission was not indefinite or a matter of opinion, see Gunter v. Hamilton Bank of Upper East Tenn., 411 S.E.2d 115, 117 (Ga. Ct. App. 1991); Palmer v. Hobart Corp., 849 S.W.2d 135, 139-40 (Mo. Ct. App. 1993), but addressed a fact in issue with regard to Margaret Jones' claim for negligent failure to warn. I agree with the majority that Ford did not admit that it had notice of a defect in the design of its electronic cruise control system. However, a judicial admission is an admission of a fact in issue. Lupica, 237 Va. at 520, 379 S.E.2d at 314. In contrast to the majority, I do not believe that a judicial admission is "incomplete and inconclusive" merely because it admits a fact in issue as opposed to an element necessary to establish a particular cause of action.

40

Since a judicial admission relieves the opposing party from having to prove the admitted fact, the relevant inquiry is whether further proof of that fact should be allowed.  The admission of such evidence lies within a trial court's discretion.  McHenry v. United States, 276 F. 761, 766-67 (D.C. Cir. 1921); Piper v. Barber Transp. Co., 112 N.W.2d 329, 336 (S.D. 1961).  A trial court may refuse to allow the introduction of additional evidence with regard to an admitted fact if such evidence would be cumulative, confusing to the jury, or would unnecessarily delay the proceedings.  Hes v. Haviland Products Co., 148 N.W.2d 509, 512 (Mich. Ct. App. 1967).  See also Walker v. Commonwealth, 258 Va. 54, 68, 515 S.E.2d 565, 573 (1999), cert. denied, 528 U.S. 1125 (2000) (within trial court's discretion to exclude relevant evidence if its probative value is outweighed by danger of unfair prejudice).  However, a party should not be permitted to preclude the introduction of otherwise admissible evidence by judicially admitting something less than what the evidence would show.  Cf. Spencer v. Commonwealth, 240 Va. 78, 91, 393 S.E.2d 609, 617, cert. denied, 498 U.S. 908 (1990)("a defendant may not preclude the introduction of otherwise admissible evidence by an offer to stipulate less than the evidence would show").

After Ford made its judicial admission, the circuit court concluded that introduction of the deposition evidence pertaining to other incidents of sudden acceleration and the Updegrove Report would have raised collateral issues and caused unnecessary delay in the trial. I agree. Thus, I conclude that the circuit court did not abuse its discretion in this case unless the excluded evidence was, otherwise, admissible and established facts outside the scope of Ford's judicial admission, that is, if Ford admitted something less than what the proffered evidence would have shown. See Spencer, 240 Va. at 91, 393 S.E.2d at 617. Even if the majority were correct that Ford's judicial admission was illusory, the pertinent inquiry is the same: whether the Updegrove Report and the deposition testimony of other similar incidents of sudden acceleration were admissible. I turn now to that question.

Jones sought to introduce the Updegrove Report and the deposition testimony describing other sudden acceleration incidents in order to establish that Ford knew or had reason to know that the electronic cruise control system installed in its 1991 Lincoln Town Car was or was likely to be dangerous for the use for which it was sold. See Featherall v. Firestone Tire & Rubber Co., 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979). This Court has stated on numerous occasions that

"[e]vidence of other similar accidents or occurrences, when relevant, is admissible to show that the defendant had notice and actual knowledge of a defective condition; . . . [if the prior] occurrences happened . . . under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue . . . ." Spurlin v. Richardson, 203 Va. 984, 989, 128 S.E.2d 273, 277 (1962) (citations omitted); accord Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 137, 413 S.E.2d 630, 635 (1992); Ford Motor Co. v. Phelps, 239 Va. 272, 276-77, 389 S.E.2d 454, 457 (1990); Lupica, 237 Va. at 521, 379 S.E.2d at 314; Roll 'R' Way Rinks v. Smith, 218 Va. 321, 325, 237 S.E.2d 157, 160 (1977). "[T]he test of admissibility is . . . substantial similarity." Roll 'R' Way Rinks, 218 Va. at 325, 237 S.E.2d at 160. "If the place, the circumstances, and the defect associated with a prior accident are substantially the same as those in issue, evidence of that accident is admissible to show notice of the existence of the defect and notice of its dangerous potential." Id. at 325-26, 237 S.E.2d at 160 (emphasis added). Thus, substantial similarity requires, in part, that the other incidents be "caused by the same or similar defects and dangers as those in issue." Spurlin, 203 Va. at 989, 128 S.E.2d at 277.

43

This particular prerequisite for the admissibility of evidence of other occurrences is evident from our cases. In Lupica, we examined evidence of similar incidents and noted that most of the exhibits met the test of substantial similarity because they contained "statements of occurrences where the power steering on a General Motors automobile manufactured between 1964 and 1978 malfunctioned due to particulate in the system that caused the automobile to 'self-steer' and to go out of control." 237 Va. at 521, 379 S.E.2d at 314. For example, in one of the exhibits, which was an internal General Motors memorandum that this Court found was properly admitted into evidence, a senior project engineer for General Motors stated that examination of the power steering gear from the vehicle in question showed that "some foreign material had passed thru [sic] the valve."[1] That defect was the same as the plaintiffs had alleged was present in the vehicle owned by Lupica. Id. at 518-19, 379 S.E.2d at 312-13. In contrast, we concluded that another proffered exhibit failed the test of substantial similarity because it contained specific documentation that "'disassembly and inspection of the power steering gearbox revealed no defects due to materials or workmanship that could have been responsible in

_____

[1] This particular memorandum was not specifically addressed in our opinion in Lupica, but it was included in the

44

any way for [the] owner's accident.'"  Id. at 522, 379 S.E.2d at 315.  The significance of these examples is that the only exhibits that satisfied the test of substantial similarity were those that unequivocally established the nature of the defect and that it was the same defect as the one at issue.

Our decision in Lupica was consistent with our prior decisions regarding the admissibility of evidence of similar incidents.  For example, in Spurlin, "none of the four prior occurrences [allegedly similar to the one at issue] was shown to have been caused by defective brakes, [the defect alleged by the plaintiff], and thus [the incidents] could not have charged the defendants with notice and actual knowledge of a defective condition."  203 Va. at 989-90, 128 S.E.2d at 278.  Hence, we concluded that the trial court did not err in "excluding such collateral evidence which could only have confused the issues and misled the jury."  Id. at 990, 128 S.E.2d at 278.

Such substantial similarity, specifically, that the other events of sudden acceleration were caused by the same or similar defect as the one at issue, was not demonstrated in this case with respect to either the Updegrove Report or the deposition testimony.  Although the majority makes the conclusory statement that "the record . . . contains evidence"

_____

joint appendix, p. 682, filed with the appeal in that case.

45

that the sudden acceleration events described in the deposition testimony were "caused by the same or similar defects and dangers as those in [Jones'] case[,]" the majority fails to point to any testimony in those depositions that actually supports that conclusion or even discusses the cause of those acceleration events.[2]  Instead, the majority relies on the testimony of Victor Joseph Declercq and Samuel K. Sero (stating that the speed of a vehicle can be controlled only by use of the cruise control or application of the accelerator pedal) to infer that "the depositions contain evidence of a defect in the manufactured automobile."

Even if I were to accept that inference, which I am not willing to do, we still would not know the nature of the alleged defect in those vehicles, nor could we without additional information.  This is so because the deposition testimony raised questions about the condition of those vehicles and other possible mechanical or electrical problems. Two of the deponents acknowledged that some vehicles used by

---

[2] The majority also states that "Ford does not argue in its brief that the plaintiff failed to demonstrate that the events of sudden acceleration described by these [deposition] witnesses fail the test of substantial similarity[.]" However, on brief, Ford stated, "[T]he proffered evidence of other sudden acceleration incidents does not demonstrate that there was a defective condition in the vehicles involved in those claims.  Unlike . . . Lupica, Ford does not concede, nor has it ever been proven, that any of these collateral events

the United States Secret Service are modified in some respects, but they did not know what, if any, modifications had been made to their respective vehicles prior to the sudden acceleration events described by them.  Another deponent testified that, after the sudden acceleration incident, he received a dealer's invoice stating that the brakes had been fixed on the vehicle.  And the state trooper stated that he had experienced electrical problems involving the air conditioner, power windows, and radio in his vehicle prior to the sudden acceleration event.

This Court has never before allowed evidence of similar incidents to be admitted when that evidence did not unequivocally satisfy the test of substantial similarity.  The reasons for our long-standing position are obvious.  When evidence of similar incidents does not categorically demonstrate that those occurrences were caused by the same or a substantially similar defect as the one in issue, the parties will undoubtedly then present evidence with regard to the cause of each of those other incidents during the course of the main trial, thus diverting the jury's attention to collateral issues.  This diversion serves only to confuse the issues for the jury and to delay the proceedings.  In other

in question were caused by an electronic malfunction in the cruise control system of the vehicle at issue."

47

words, the jury would be plunged into multiple mini-trials. Thus, I conclude that the majority's holding that the deposition testimony satisfies the test of substantial similarity is not consistent with our decision in Lupica.

The majority, however, reached a different conclusion with regard to the Updegrove Report. There, the majority stated that "[t]here is simply no evidence that the . . . claims mentioned in the Updegrove Study occurred under substantially the same circumstances as the plaintiff's incident and had been caused by the same or similar defects and dangers as those in the plaintiff's case." While I agree that the Updegrove Report is not admissible because that report does not document whether those sudden acceleration incidents were caused by the same defect as that alleged by Jones, I must point out that the vast majority of the incidents described in the Updegrove Report occurred upon gear engagement, when the transmission was shifted from the park position to either drive or reverse. Thus, those sudden acceleration incidents, like those described in the deposition testimony, occurred under substantially the same circumstances as did Jones' sudden acceleration event. Yet the majority is not willing to use Declercq's and Sero's testimony in the same manner with regard to the Updegrove Report as it does with respect to the deposition testimony. However, for the purpose

48

of determining whether either the Updegrove Report or the deposition testimony satisfies the test of substantial similarity, there is no practical difference between the two items of evidence. They may differ in other respects, but those differences have no bearing on whether the test of substantial similarity is satisfied. Thus, in my view, the majority's treatment of those items of evidence is inconsistent.

I also believe that the effect of the majority's decision to require admission of the deposition testimony is to allow evidence of similar incidents to be used as proof of the defect or "corroboration." Phelps, 239 Va. at 276, 389 S.E.2d at 457. As I have already noted, the majority is drawing inferences from evidence pertaining to the cause of Jones' accident to establish the defect or the cause of the sudden acceleration events described in the deposition testimony. By proving the defect in those occurrences in that manner, the majority is, in the final analysis but without acknowledging that it is doing so, using those depositions along with the same inferences to establish the defect in Jones' vehicle. Yet this Court has explicitly stated that evidence of similar incidents cannot be used as proof of the defect. See id.

Thus, I conclude that neither the deposition testimony nor the Updegrove Report satisfies the test of substantial

similarity, and therefore, neither was admissible as evidence of similar incidents relevant to the issue of notice, irrespective of Ford's judicial admission. Admittedly, Jones was not allowed to introduce evidence that she considered vital to her case, but I cannot say that the circuit court abused its discretion.[3]

The majority also concludes that the deposition testimony was admissible to contradict Declercq's statement that Jones' vehicle could not have suddenly accelerated other than by her application of the accelerator.  Jones presents the question of using the evidence of similar incidents to impeach the credibility of Declercq under her third assignment of error, which states:

> The trial court erred in not permitting the plaintiff to cross-examine the defense expert witness (Declercq) to show that sudden acceleration incidents, in a stationary vehicle, upon shifting to reverse or drive, and accompanied by a driver's ineffective attempt at braking, coincided with the introduction of the electronic cruise control; and further erred in limiting cross examination based on the attorney work product doctrine.

I do not believe that this assignment of error fairly includes the issue decided by the majority.

---

[3] Although the majority concludes that the deposition testimony is admissible upon retrial, I note that the circuit court never ruled on Jones' motion for permission to use those depositions at trial in lieu of live testimony  from those individuals.

Notwithstanding that problem, this use of the deposition testimony amounts to evidence of similar incidents being utilized to corroborate Jones' testimony about the cause of her vehicle's sudden acceleration. However, this Court has stated that, even when substantial similarity is demonstrated, evidence of similar incidents is not admissible as corroboration. Phelps, 239 Va. at 276, 389 S.E.2d at 457. Nor can such evidence be used to prove causation at the time of Jones' accident. See Roll 'R' Way Rinks, 218 Va. at 327, 237 S.E.2d at 161.

## II. TESTIMONY OF FORD EXPERT WITNESS BRACKETT

Unlike the majority, I believe that Jones' objection to the testimony of Robert Quinn Brackett, Jr., was sufficient. However, I find no error in the circuit court's admission of that testimony.

On appeal, Jones challenges the admission of Brackett's testimony on two grounds. Relying on this Court's decision in Keesee v. Donigan, 259 Va. 157, 524 S.E.2d 645 (2000), she first claims that there was no foundation to establish that the circumstances of the test in which three of roughly one hundred subjects misapplied the accelerator pedal were substantially similar to the events confronting Jones. However, I conclude that Jones has waived this argument because she elicited much of the evidence about which she now

51

complains.  See Combs v. Norfolk & Western Ry. Co., 256 Va.

490, 499, 507 S.E.2d 355, 360 (1998); Hubbard v. Commonwealth,

243 Va. 1, 9, 413 S.E.2d 875, 879 (1992).

In her second challenge to Brackett's testimony, Jones

asserts that he testified as to "hearsay matters of opinion

upon which [he] relied in reaching his own opinion."  McMunn

v. Tatum, 237 Va. 558, 566, 379 S.E.2d 908, 912 (1989).  Jones

references the following response by Brackett when asked if he

had an opinion whether Jones may have mistakenly applied the

accelerator pedal:

> Basically based on the information that I reviewed and
> the – the absence of evidence of any electrical or
> mechanical malfunction, based on the examination by both
> parties of the vehicle after the accident and no
> recognition or no evidence of brake failure after the
> accident, I concluded in addition with my experience that
> a brake accelerator pedal misapplication was highly
> likely.

Also, Brackett acknowledged that his understanding that there

was no physical evidence of mechanical or electrical

malfunction was based on the opinions of other experts in this

case.

In making this argument, Jones ignores the fact that the

opinions about which Brackett testified in explaining his own

opinion were those of other experts who testified in this

case.  In fact, Sero did not dispute that there was no

physical evidence found after the accident indicative of

52

mechanical or electrical malfunction, or brake failure. Thus, unlike the expert in McMunn, Brackett testified as to opinions of experts "whose qualifications [were] established to the satisfaction of the court, whose demeanor[s were] observed by the trier of fact, and whose pronouncements [were not] immune from cross-examination." Id.

### III. CONTRIBUTORY NEGLIGENCE AND SUDDEN EMERGENCY INSTRUCTIONS

The majority's discussion of the contributory negligence and sudden emergency instructions is dicta. The propriety of any given jury instruction depends upon the evidentiary record developed at trial, because "[j]ury instructions must be supported by at least some evidence." Cofield v. Nuckles, 239 Va. 186, 191, 387 S.E.2d 493, 496 (1990) (citing Van Buren v. Simmons, 235 Va. 46, 51, 365 S.E.2d 746, 749 (1988)). However, because the remand of this case is based upon reversal of some of the circuit court's evidentiary rulings, we cannot know what the evidence will be upon retrial. Thus, we do not know at this time whether instructions on contributory negligence and sudden emergency will be warranted at the new trial.

Nevertheless, I agree with Ford's argument that any error in granting the instruction on contributory negligence and refusing to instruct the jury on the doctrine of sudden

emergency was harmless.  The verdict form shows that the jury found in favor of Ford on both the claims for negligent design and negligent failure to warn.  Thus, the jury did not reach the question of Jones' contributory negligence.  Indeed, the jury left the space for the answer to that question blank on the verdict form.  Because the jury did not consider the issue of Jones' potential contributory negligence, it was not necessary for the jury to consider whether she may have been confronted with a sudden emergency which would have excused her alleged contributory negligence.  Thus, I conclude that any error, both in instructing on contributory negligence and in refusing to instruct the jury on sudden emergency, was harmless.

For these reasons, I dissent with regard to that part of the majority opinion allowing the introduction of the deposition testimony and with respect to the majority's conclusions regarding the contributory negligence and sudden emergency instructions.  I concur as to the issue concerning the testimony of Brackett and conclude that the circuit court did not err in admitting that testimony.  Finally, I agree with the majority opinion on any issues that I have not separately addressed.

Thus, I would affirm the judgment of the circuit court.