## FRANK LEE STOOTS AND CLINTON LEROY STOOTS v. COMMONWEALTH OF VIRGINIA.

October 8, 1951.

Record No. 3892.

Present, All the Justices.

The opinion states the case.

*Ted Dalton* and *Richard H. Poff,* for the plaintiffs in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

On Sunday afternoon, February 13, 1949, the body of Charles Lewis McFall was found in a cistern in his back yard, in which there was about eight feet of water. His throat had been cut and he was dead before he was put into the cistern.

Frank and LeRoy Stoots, defendants below, along with Myrtle Stoots Orange, who is a sister of Frank Stoots and an

aunt of LeRoy Stoots, were jointly indicted for the murder of McFall. Mrs. Orange was tried separately in October, 1949, was convicted of second-degree murder, sentenced to 15 years in the penitentiary, and her conviction affirmed by this court. *Orange v. Commonwealth,* 191 Va. 423, 61 S. E. (2d) 267.

Thereafter the present defendants were tried jointly, convicted of second-degree murder and sentenced to seven years in the penitentiary. We granted a writ of error to consider their claim that the evidence was not sufficient to support the jury's verdict and that the trial court erred in the admission of testimony and in its rulings on instructions.

The circumstances of McFall's death are stated in the *Orange Case* and it is not necessary to repeat them now in detail. The material witnesses and the material evidence were practically the same in both trials. Such differences as occurred will be referred to in the course of this opinion.

McFall, fifty-three years old and unmarried, lived in a house on State Route 99, about two miles east of the town of Pulaski. Frank and LeRoy lived on the same road, west of the McFall house, and Mrs. Orange, who was separated from her husband, had her home there with them. For about two months prior to McFall's death, Mrs. Orange had been living with him in his home over the week-ends. On this occasion she had gone to his home on Thursday before his death on Sunday, and they did much drinking. On Saturday morning McFall went to town and borrowed some money. In the afternoon in a drunken condition he went out on the porch and fired a pistol. Afterwards she took the shells out, put them in her pocketbook and hid the pistol in a potato sack in the kitchen, because he had threatened her and she was afraid. Later that afternoon they walked to Morris' service station, about a mile and a half east of McFall's house, and there McFall paid a bill, bought two pints of whiskey from which he drank, and she had to help him back home and into bed.

On Sunday morning Frank and LeRoy Stoots went to the McFall house about nine-thirty to get a drink. McFall let them in and they were there for some time drinking whiskey and beer. McFall had missed his pocketbook and thought he had left it at Morris' the afternoon before. It was decided he and the defendants would go there and inquire. The defendants went out into the front yard and waited at the road for McFall to dress.

In a few minutes he came out and told them to go ahead; that he would get Mrs. Orange up and get some breakfast.

The defendants walked out the road to Morris' service station, where LeRoy was told the pocketbook was not there. They returned to the McFall house between twelve and twelve-thirty, coming down the railroad and approaching the house from the back. There, they testified, they saw Mrs. Orange standing on the back porch, with an axe in her hand, bleeding and very bloody. There were spots of blood on and near the cistern. The top, on which was a big spot of blood, was laid back and LeRoy put it back on. Mrs. Orange called to LeRoy, but he ran back down to the railroad, saying he was going for help. Frank testified there were blood spots on the porch and all through the room; that he talked to his sister a minute or two to find out who did it, and then told her there was nothing for him to do but get an ambulance and "the law." He did not see McFall anywhere, he said.

Mrs. Orange, called and examined by the Commonwealth as an adverse witness, testified on this trial that after these defendants left the house to go to Morris', McFall beat her when nobody was there except McFall and her, and that she did not remember seeing the defendants when they came back to the house. She testified, "They said they come back and talked to me, but I don't remember seeing them. I were crazy. I were beat crazy;" and that whatever was done there was done after the defendants left. The details of her beating by McFall, as given by her on her own trial, are stated at page 431 of 191 Va., and at page 270 of 61 S. E. (2d). She said the last time she saw McFall he was alive.

On the trial of Mrs. Orange the present defendants were called and testified as witnesses for the Commonwealth. There is no material difference between their testimony on that trial and on this. On the evidence adduced in the *Orange Case,* the Commonwealth advanced as a plausible but not the only theory that after these defendants left the house, McFall found that Mrs. Orange had his pocketbook and in a rage beat her, after which, and drinking as he was, "he lay down on the bed, whereupon she took from the medicine cabinet the razor he had shaved with the day before and slashed his throat."

In our opinion in the *Orange Case,* 191 Va. at pp. 436-7, 61 S. E. (2d) at p. 273, we said:

"It is a most reasonable inference that McFall was killed as

he lay on the bed. There is no other explanation of the blood on the pillow. The evidence is without conflict that there was no person other than the defendant with McFall until her brother and nephew came back from Morris'. She testified that she was entirely certain that they did not kill him. There was no sign of a fight or struggle in the house. The proved facts warranted an inference by the jury that, smarting under the beating he had given her and moved by a desire for vengeance for his cruel treatment, she cut his throat with the razor while he was lying on the bed, probably asleep or stupid from the effects of his drinking.''

On the evidence in this record, the attorney general now says that it is entirely possible that these defendants had not withdrawn from hearing distance when McFall began to abuse Mrs. Orange; that they thereupon returned, grabbed McFall and killed him or held him while Mrs. Orange did, and then disposed of his body; that Mrs. Orange then became unconscious and these defendants, believing she would bleed to death, ''made the planned round-trip.''

That, perhaps, is a possibility, but more than a possibility is required to warrant a conviction. The verdict here cannot be sustained unless the evidence establishes the guilt of these defendants beyond a reasonable doubt.

There is not evidence in this case sufficient to warrant a rejection of the theory on which Mrs. Orange's conviction was sustained, and the adoption of a theory now that these defendants, not Mrs. Orange, wielded the weapon with which McFall was killed. The theory that these defendants came back into the house and killed, or aided in killing, McFall before they went to Morris', is pure conjecture, not supported by evidence and contrary to the uncontradicted evidence.

For the Commonwealth it is argued that in the *Orange Case* the story told by Mrs. Orange excluded the possibility of the blood on the pillow being her blood; whereas, in the present case the Commonwealth proved by Mrs. Callie Akers, who did not testify in the *Orange Case,* that when Frank Stoots came up to the Taylor car in which she was riding, as referred to later herein, to ask them to call an ambulance, he said that Mrs. Orange was ''bleeding to death up there on the bed.'' Taylor testified, as he did in the Orange trial, that Frank said she was ''laying across the bed.'' It is then argued that the evidence in this case

is that she was bleeding profusely, and that the jury could believe that the blood on the pillow was her blood; that hence it becomes unreasonable on this evidence to believe that McFall was killed as he lay on the bed, and impossible to believe that Mrs. Orange committed the crime alone. The suggestion is that McFall was killed, perhaps by Mrs. Orange while these defendants held him, in front of the medicine cabinet mirror, on which were spurts of blood.

That would be quite a drastic change to be wrought by the mere possibility that the blood on the pillow was the blood of Mrs. Orange. We pointed out in the *Orange Case* that the pillow on the bed was very bloody, at least half of it being soaked with blood; that the doctor testified that Mrs. Orange had no severe loss of blood; yet her own clothing was saturated with blood on the opposite side from her wounds. Also the doctor testified that there would be no spurting of blood from McFall's wound, but a profuse bleeding. Furthermore, there was no blood on his clothes, only a splotch of what would appear to be dried blood on his chest at the base of his neck. It is hard to find in these facts support for the idea that he was on his feet, instead of on his bed, when he was killed. These and other facts to be noted do not indicate that the theory on which the Commonwealth secured the conviction of Mrs. Orange should now be abandoned.

McFall was still alive, according to the Commonwealth's evidence, at approximately eleven o'clock Sunday morning. Mrs. Akers and Andrew Taylor, mentioned above, on their way to Draper, drove by the McFall house at a time her evidence fixes as about eleven o'clock. There she saw Frank and LeRoy Stoots, whom she knew, standing beside the mailbox at the road, and she saw a man, dressed as McFall is described as having been dressed, coming off the porch toward them. LeRoy spoke to her as they passed by. She was at Draper not more than 15 minutes, she said. On the return trip from Draper she saw Frank Stoots on the front porch of the McFall house leaning against a post. She did not fix the time of this occurrence but it can be placed from her other evidence at about 12:15 p.m.

In the meantime, these defendants were seen by another witness for the Commonwealth at approximately 11:30 a.m. near Morris' filling station and walking toward it. Morris testified that LeRoy came to his place close to noon, inquiring for Mc-

Fall's pocketbook. Runyon, witness for the Commonwealth, testified that before twelve o'clock Frank and LeRoy came by his house, which apparently was a short distance from Morris', and there stopped at his mailbox and had a conversation between themselves. Frank came in and sat on the porch for about ten minutes, then walked on in the direction of the filling station. He did not see them come back.

Not only does the Commonwealth's evidence fail to prove that the defendants went back into the house before leaving for Morris', but rather it confirms their evidence and that of Mrs. Orange that they did not do so. It is hardly a possibility that they could have been in the yard with McFall at eleven o'clock, stayed on there until they heard the trouble between McFall and Mrs. Orange, gone back into the house and killed McFall, disposed of his body, rid themselves of any sign of the encounter, then walked the mile or so to Morris', all in less than an hour. What is proved here does not make untenable the hypothesis of the *Orange Case* that McFall was killed while lying on the bed, probably asleep or stupid from drink. In that event aid from these defendants was not required. There is little in the evidence to support the theory that they gave any.

The reasonable inference from the evidence is that McFall was killed without a struggle. There was much blood in the house, as described in the *Orange Case*. There was no scratch or wound on these defendants. Except for one overturned chair, there was no indication of a struggle in or out of the house. There was no blood on the clothing worn by either of these defendants, nor in the scrapings from their fingernails. No fingerprint of either defendant was developed from the razor or the axe.

Under the evidence the only time either of these defendants was in the house after they left it to go to Morris' was on their return from Morris' some time after twelve o'clock. There is no evidence that LeRoy was in the house after returning from Morris'. There is only surmise to contradict the testimony that he ran away when he saw Mrs. Orange standing at the kitchen door. Only by substituting conjecture for evidence can he be placed in the house. The attorney general says that the story told by these defendants is conclusive that either both are guilty or neither is.

Frank Stoots admitted both on this trial and on Mrs. Orange's

trial that he entered the house after coming back from Morris'. Prior to testifying he had denied that. His explanation of the contradiction was that he "was just tore up about the whole thing," but knowing he was not involved in it, he decided to say he did not go into the house; otherwise it might be thought he was involved. He said his only reason for going into the house was to get a bottle of whiskey he saw on a table in the bedroom to keep his sister from drinking it. The sheriff testified he could not have seen this bottle from the back porch, as he claimed.

As the defendants were leaving to go to Morris', McFall gave Frank Stoots a quarter to buy cigarettes for him. Frank bought no cigarettes and a quarter was found in the blood on the floor in the bedroom. In the cistern was found a Gillette razor blade still in its waxed paper and within the small outer carton in which they are sold. In an outside pocket of the coat Frank Stoots was wearing was a similar package containing two of such blades. There was some blood on the sole of Frank's shoe. He said he did not know it was there until he was in jail; that he started to scrape it off but did not do so when he realized the officers would want to see it.

When Taylor was fixing a flat tire on the car in which Mrs. Akers was riding, on their return trip from Draper, and at about 200 yards west of the McFall house, LeRoy came into the road from the railroad and went on toward the Stoots home. This was "five or eight minutes, maybe ten," after Mrs. Akers saw Frank on the McFall front porch. Before LeRoy "got all the way out of sight," Frank came down the road, inquired if they had a telephone, was told they did not, then asked them, when they got to town, to "call the law and tell them to come down to Charlie McFall's, that there is a man that has beat his wife up with an axe." Frank then went around behind a little building where he took a drink from the bottle he brought away from the McFall house, came back after "five or eight minutes," inquired whether they wanted one, and again asked that they "please call the law" when they got to town and "tell them to bring an ambulance up here, that woman is bleeding to death up there on the bed." He added that she was his sister. Taylor and Mrs. Akers did not report the matter. She said he seemed to be drinking and she "just thought maybe someone had a little family argument." Both Frank and LeRoy went on to the Stoots home without doing anything more toward calling an

ambulance, leaving Mrs. Orange to take care of herself and make her way as best she could from the McFall house to the Stoots home, which she reached around 45 minutes later.

Mrs. Orange testified on this trial that McFall weighed 197 pounds and she 104, and that she could not lift 100 pounds. That statement, the testimony in reference to the razor blade in the cistern, the quarter on the floor, the testimony of Mrs. Akers, and the statement by Frank Stoots that his reason for going into the house after returning from Morris' was to get the bottle of whiskey in order to keep his sister from drinking it, and a more limited examination of Mrs. Orange, comprised the main differences between the evidence on this trial and that on the Orange trial.

The Commonwealth argues that the evidence on this trial was sufficient to establish beyond a reasonable doubt that the circumstances of time, place, motive, means, opportunity, and conduct, concurred in pointing out these defendants as the murderers of McFall, or as aiders and abettors in that crime. But very similar facts and circumstances have been held to point to Mrs. Orange as the criminal agent, to whom time, place and opportunity were available, her motive stronger and her conduct more suspicious. The circumstances, therefore, lacked the powerful strengthening that comes from "the total absence of any trace or vestige of any other agent." *Dean* v. *Commonwealth,* 32 Gratt. (73 Va.) 912, at p. 926; *Orange* v. *Commonwealth, supra,* 191 Va. at p. 435, 61 S. E. (2d) at p. 272.

The evidence and the inferences from it fail to put LeRoy in or about the McFall house when McFall was killed. The facts and circumstances proved are more consistent with the theory that Frank Stoots hid or helped Mrs. Orange to hide McFall's body after she had killed him, than with the theory that he killed him or aided her in doing so. If the facts and circumstances proved are as consistent with innocence as with guilt, then the evidence is not sufficient to sustain the verdict. Suspicion is not enough; conjecture is not proof. *Cox* v. *Commonwealth,* 140 Va. 513, 517, 125 S. E. 139, 141; *Garner* v. *Commonwealth,* 186 Va. 600, 613, 43 S. E. (2d) 911, 917.

We are unable to find evidence in this record sufficient to support the verdict, and the judgment below will be reversed. The other assignments of error require some discussion, in the event there is another trial.

The Commonwealth was allowed to call Mrs. Orange as an adverse witness, subject to the right of cross-examination by both sides. She testified that she did not see the defendants back on the premises after they went on the errand to Morris's filling station. Upon her stating that she had no recollection of saying otherwise, a deputy sheriff was called and allowed to testify that she did say on a prior occasion that the defendants returned to McFall's after they had been to Morris', and that she had called to LeRoy; and that in another statement she said "she did leave before them." The assignment of error is to admitting the prior statements of Mrs. Orange, not to the calling of Mrs. Orange as an adverse witness.

It is not a new procedure for the court in a criminal trial to call a witness to testify, giving both sides the right to cross-examine. 58 Am. Jur., Witnesses, § 4, p. 25. It is sometimes necessary in the interest of developing the facts; for instance, where there is an eye-witness who is known to be hostile to the party who makes the motion. It is sanctioned by our statutes and our former decisions. Code, 1950, §§ 8-291, 8-292; *McCue* v. *Commonwealth,* 103 Va. 870, 996, 49 S. E. 623, 627; *Smith* v. *Commonwealth,* 136 Va. 773, 118 S. E. 107; *Trout* v. *Commonwealth,* 167 Va. 511, 188 S. E. 219.

It is a procedure that can be abused and the trial court should be careful to see that it is resorted to in good faith, and not used to get before the jury testimony otherwise inadmissible. Such prior inconsistent statements are, of course, not substantive evidence. They are admissible only for the purpose of contradiction and the court must so instruct the jury if requested. Code, 1950, § 8-292. *Roy* v. *Commonwealth,* 191 Va. 722, 62 S. E. (2d) 902. The defendants here did not make such request.

The court refused to give for defendants their Instruction No. 5, which would have told the jury, in accordance with section 18-4, Code, 1950, that a brother of a principal felon may not be deemed an accessory after the fact, and that if Frank Stoots "did not participate in the commission of the offense," the jury must find him not guilty. The court thought it might be misleading as written, but offered to give it if amended by adding after the quoted phrase the words "as principal in the first or second degree." It was proper to refuse the instruction without the amendment. By Instruction G the jury were told that to

make a person a principal in the second degree it was not neces-sary that he "actually participated in the commission of the crime." The amendment would have reconciled the two in-structions. The jury should have been instructed, however, that if Mrs. Orange alone killed McFall, then Frank Stoots could not be convicted if all he did was to hide, or help to hide, the body after McFall was killed.

Error is assigned to the giving of Instruction J on the ground that it is a repetition of Instruction G. The latter cor-rectly defined principals in the first and second degree. Instruc-tion J was primarily on the question of the kind and measure of proof, and there was no error in giving it.

It was error to give that part of Instruction I which told the jury that "where all the circumstances of time, place, motive, means, opportunity and conduct, concur in pointing out the ac-cused as the perpetrators of the crime, it must produce a moral, if not absolute, certainty of their guilt." That is a correct quo-tation from *Dean* v. *Commonwealth, supra,* also quoted in *Orange* v. *Commonwealth, supra;* but a statement in an opinion does not always make an apt instruction to the jury. It may represent the reasoning by which the court arrives at a conclusion, or be an expression of its opinion on the facts. *Abernathy* v. *Emporia Mfg. Co.,* 122 Va. 406, 413, 95 S. E. 418, 420; *News Leader Co.* v. *Kocen,* 173 Va. 95, 109, 3 S. E. (2d) 385, 391, 122 A. L. R. 842. In the *Dean Case* the statement was used to test the sufficiency of the evidence to support the verdict after the jury had rendered it. To tell the jury before they find their verdict that a concur-rence of the stated elements *must produce certainty of guilt* is to comment on the weight of evidence, and hence to invade the jury's province. 10 M. J., Instructions, § 33, p. 238.

The judgment of conviction is reversed and the case is re-manded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*